J-A18010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| STEVEN DAVID VOGT | |
| Appellant | No. 1186 WDA 2021 |

Appeal from the PCRA Order Entered September 29, 2021
In the Court of Common Pleas of Butler County
Criminal Division at No.: CP-10-CR-0030816-1990

BEFORE:  STABILE, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY STABILE, J.:                    **FILED: MAY 31, 2023**

Appellant Steven David Vogt appeals from the September 29, 2021 order of the Court of Common Pleas of Butler County ("PCRA court"), which denied his fifth petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46.  Upon review, we affirm.

The facts and procedural history of this case are undisputed.  As summarized by a prior panel of this Court:

> On May 13, 1990, two persons who were scuba diving in a strip mine quarry that had been filled with water, discovered a body in the lake.  In the pocket of a fatigue jacket that the deceased was wearing was a wallet that contained an operator's license belonging to Mr. Francis Landry ("Mr. Landry"), and a registration card for his 1985 Nissan Stanza.  Dr. Carl Williams, M.D. testified as a forensic pathologist that the victim, Mr. Landry, suffered a blunt force trauma to the skin surface, to the head, trunk, and the extremities and that death occurred as a result of asphyxiation due to drowning.

On May 12, 1990, Mr. Landry picked up [Michael] Sopo ("Sopo"), [Margaret] Zawodniak ("Zawodniak"), and [Appellant] in his blue Nissan in order to take them to his residence in Export. They drank beer there although Mr. Landry did not. Mr. [Walter Sherman] Cowfer ("Cowfer" or "Sherman") arrived later. The parties left Mr. Landry's home and went down the road to Mr. Arthur McClearn's ("Arthur") apartment where they continued to drink and discussed the murder of Francis Landry. The parties returned to Mr. Landry's residence and drank for a while. Cowfer went to Mr. Landry's car in which he was sleeping and asked to use the car to go to Cupec's Lake. Although Mr. Landry did not want to go, Cowfer ordered Landry to get in the back seat or threatened that he would put him in the back seat. Mr. Landry got out and moved into the back seat. Testimony revealed that Mr. Landry was being elbowed and hit in the chest area while seated between two people in the back seat. Testimony revealed that [Appellant and Cowfer] got out of the car at the lake and began walking down the path to the lake with Mr. Landry. Mr. Landry was complaining about his chest hurting and protesting to go any further [sic]. Mr. Landry was heard yelling and was seen going down over the hill to the lake which was about a 35 to 40 foot drop. Evidence revealed that Mr. Landry was in the lake treading water and yelling that he would give them $10,000.00 if 'they didn't do him.' Additional testimony revealed that rocks were being thrown at Mr. Landry. A huge rock which was set up on the bank, was rolled over the hill and appeared to hit Mr. Landry.

*Commonwealth v. Vogt*, No. 1291 PGH 1991, unpublished memorandum, at *2-3 (Pa. Super. filed October 21, 1992).

Appellant, Cowfer, and Arthur were apprehended in Florida several days after the murder. The Commonwealth prosecuted Appellant, Zawodniak, Cowfer, Sopo, and Arthur for their roles in Mr. Landry's murder. Sopo pled guilty to conspiracy and Arthur pled guilty to third-degree murder. Both men—Sopo and Arthur—testified on behalf of the Commonwealth at trial.

- 2 -

Sopo testified that he was 18 years old at the time of the murder. ***See*** N.T., Trial, 1/29/91, 85. He did not provide any eyewitness testimony to the murder. He testified about the events leading up to the trip to Cupec's strip mine. When asked what he recalled next after the group got into Mr. Landry's car, he replied that he remembered finishing up his beer and waking up in the car. ***Id.*** at 97. He advised that Cowfer was driving and when he asked about the whereabouts of Mr. Landry, he was told that Mr. Landry was swimming. ***Id.*** at 98. He advised that after that statement was made, the group went to Export. ***Id.*** At that point, "Mrs. Zawodniak got out of the vehicle. [Arthur] gathered some things up and we left." ***Id.*** at 99. There was no mention of a stop at the residence of Carrie Deiseroth ("Deiseroth") and Leonard Mayhugh ("Mayhugh"). He then detailed the group's travel to other states and the cashing of Mr. Landry's checks. ***Id.*** at 99-102. On cross-examination, the following exchange occurred:

Q: Now, when you got down to Export, isn't it a fact that you went and bought some marijuana?

A: Not that I could recall, no, sir. I don't remember buying any marijuana.

Q: You don't remember that. You don't remember all of you going in a car to somebody's house for the expressed purpose of getting marijuana before you started your trip to New Mexico or Mexico or Kentucky or wherever you were going? You don't have a recollection of that?

A: No, sir. Not that I could remember, no.

Q: The next thing you know you were I-279 and you were headed south?

A: Yes, sir.

Q: You had no idea where you were going?

A: No, sir.

*Id.* at 136.

Deiseroth appeared before the jury and testified that at 9:00 a.m. on May 13, 1990, Cowfer arrived and entered her Lower Burrell residence with "some other kid."[1]  N.T., Trial, 1/30/91, at 4.  She had not seen him for one year prior to that date.  *Id.*  Cowfer asked to see Mayhugh and she then observed Cowfer "kneeling down talking to [Mayhugh] down beside the couch."  *Id.* at 5.  She advised that while Cowfer was speaking with Mayhugh, she overheard the following:

> Well, Sherman said, I never thought I could do it.  [Mayhugh] says, what are talking about.  I never thought I could do it.  I killed somebody.  Come on, Sherman, you didn't do nothing like that, he said.  Yes, I did.  He said, we pushed him over the quarry and blub, blub, blub, to the bottom of the quarry he went.

*Id.*  When asked how Cowfer arrived at her home, Deiseroth advised that he arrived in "a little, blue car" and that there were two other people in the car besides the individual that came into her home with Cowfer.  *Id.*  Deiseroth recalled that she smelled alcohol on Cowfer's breath.  *Id.* at 11.  After Cowfer finished speaking with Mayhugh, he "and the other kid got up and left."  *Id.* at 5-6.  During cross-examination by Cowfer's attorney, Deiseroth stated that she did not speak with the police until one week prior to trial and did not know

_____

[1] Appellant was nineteen years old at the time of Mr. Landry's murder.

- 4 -

the individual who accompanied Cowfer. *Id.* at 9-10. This individual did not speak while at her home. *Id.* at 10. Deiseroth was not cross-examined by counsel for [Appellant].

The Commonwealth next offered the testimony of Mayhugh, who testified that on May 13, 1990, Cowfer and "a friend" showed up at his house. Mayhugh recalled:

> And he come in and he kneeled down and he was talking to me. And he says to me, he says, "I don't believe I did it. He goes, never thought I could do something like that, but I killed someone. And I really didn't know if he was telling the truth like joking around or serious, but the more I looked at him, I knew that he must have. . . . . He said he had been out partying and that he says that someone was giving him trouble or something like that. And he told him to come over here and he was showing somebody to look over this hill. And he said, I run and I push him over the hill. He said, we did - - he said we went over the hill and they drownt (sic) this guy. I mean, I didn't know who it was and that. And I listened to the news and that and I heard about a guy found in the pond. But - - and Sherman said that he drownt somebody in the quarry.

*Id.* at 15-16.

During cross-examination by Cowfer's counsel, Mayhugh testified that "the only thing that was on my mind was whether he did it or he didn't do it. I was upset because I never thought Sherman would do something like that." *Id.* at 18.

> Q: He came to your home with somebody else. Did you recognize that individual?
>
> A: Yes, I did. But I didn't know him. I don't know the guy.
>
> Q: You didn't know him.

A: Right. He says he was just a friend of his.

Q: This guy had never been to your house before?

A: No.

Q: But you recognized him?

A: Right.

*Id.* at 19-20. Counsel for [Appellant] did not mention Deiseroth and Mayhugh during his closing argument.

Next, Arthur testified at trial that during the evening of May 12, 1990, Zawodniak, Sopo and he were drinking beer when Appellant and Cowfer advised that they were leaving. *Id.* at 37. The group went out to Mr. Landry's car where Mr. Landry was sleeping in the front seat. *Id.* Cowfer proceeded to knock on the window. *Id.* Mr. Landry then asked what Cowfer wanted. *Id.* Cowfer advised that they were going to Cupec's Lake and Mr. Landry indicated that he did not want to go. *Id.* After asking a few more times, Cowfer stated "get in the back seat or I'm going to put you in the back seat." *Id.* at 38. Mr. Landry complied. *Id.* The group then got into Mr. Landry's car. *Id.* Arthur testified that he fell asleep and when he awoke, they were at Cupec's Lake. *Id.* at 39. Arthur told the jury that he, Appellant, Cowfer and Mr. Landry got out of the car and walked into the woods. *Id.* Appellant and Cowfer instructed Arthur to just follow the path as it led to the lake. *Id.* Arthur testified:

> Mr. Landry was complaining about his chest hurting. So we stopped for a few seconds. He stated that he didn't want to go any more. [Appellant] said, 'I'll help him.' He took him by his arm and his elbow and was helping him walk. He stopped again.

> He said his chest was hurting bad, he didn't want to go any further. We stopped. I turned around. [Cowfer] said, 'here' he threw me a wallet and he told me to see if there was any money in it.

*Id.* at 39-40. Arthur stated that he opened Mr. Landry's wallet, determined it was empty, and threw it back to Cowfer. *Id.* at 40. Arthur further testified that as he turned around to walk away, he heard Mr. Landry yell. *Id.* When he turned around, he saw Mr. Landry going over the hill into the lake. *Id.* According to Arthur, Mr. Landry was yelling, "Don't do me, I'll give you $10,000.00." *Id.* 40-41. Arthur recalled that he could hear rocks hitting the water. *Id.* at 41. Arthur testified that he stayed there for an hour or longer and heard Mr. Landry yell a few times. *Id.* Arthur stated that "[e]very once in a while you could see his feet, you could see ripples come out into the water." *Id.* Arthur also testified that Appellant asked him to help him get a rock. *Id.* Arthur then proceeded to help Appellant set up a rock on the top of the bank. *Id.* He advised that the rock eventually went down over the hill. *Id.* When Arthur started to leave, Cowfer asked him to get a rope. *Id.* Appellant then went down over the hill and Arthur testified that he "saw Mr. Landry pushed out from the shore." *Id.* Arthur observed that Mr. Landry tried to tread water. *Id.* Arthur testified that he eventually went back to the car and that Mr. Landry "went under." *Id.* He stated that once he returned to the car, [Appellant] and Cowfer emerged from the woods. *Id.* at 42. The group thereafter left the area. When asked where they went, Arthur testified:

> Someplace around New Kensington or Tarentum, first. We dropped [Zawodniak] off. From there we went a little farther. I'm

not sure how far it was. We stopped at another guy's house, bought $10.00 worth of marijuana. . . . . We left the man's house. We went back to Export. We got to my house, first, went in and got clothes. From my house we went to [Cowfer's]. [Cowfer] went in his house and got a jacket, clothes, shoes. I don't know what else he got.

*Id.* The four men then proceeded to a "Shop and Save" where Arthur cashed one of Mr. Landry's checks. *Id.* at 43. Then they drove to Ames Department store to buy clothes and then stopped at another Shop and Save where Arthur cashed yet another check. *Id.* After that, they took the car through a carwash and vacuumed it out because it was covered in mud. *Id.* at 44. They eventually entered the turnpike. *Id.* When Arthur awoke, they were at a Knights Inn in Kentucky. *Id.* He testified that they ultimately arrived in Key West a week after leaving Pennsylvania. *Id.* at 46. Arthur ultimately turned himself into the Key West Police after his group abandoned him at a gas station. *Id.* at 47-48.

During cross-examination by Appellant's counsel that spanned over eighty pages of the trial transcript, Arthur agreed that he pled guilty to criminal charges even though he was not guilty of committing them because he wanted to obtain a good deal for himself. *Id.* at 50. Arthur remarked that he was guilty "just for being there." *Id.* at 51.

Q: Can you tell me whether or not at the time that you entered into this plea agreement if you were told by the District Attorney's Office or by your attorney that in fact you might be facing the death penalty?

A: They told me I might be facing the death penalty.

Q: Was that one of the reasons you agreed to pled guilty to these things that you now say you didn't do?

A: Yes, it was.

*Id.* at 52.

Appellant's counsel then reviewed all of the maximum sentences associated with the crimes to which Arthur pleaded guilty, pointing out that Arthur only received a sentence of four to eight years in light of the plea agreement. *Id.* at 52-53. Arthur was then questioned about all of the alcohol he consumed on May 12, 1990, as well as his ingestion of Percocet and marijuana. *Id.* at 54-58, 65.

With respect to his relationship with Cowfer, Arthur testified that he had known Cowfer approximately ***one and one-half months prior*** to murder and agreed that their acquaintance basically centered around drinking. *Id.* at 59. With respect to Appellant, Arthur stated that he ***had never met Appellant prior to the evening in question***. *Id.* at 60. During cross-examination, Arthur also was questioned about inconsistencies between his statements to police, his preliminary hearing testimony and his trial testimony. *Id.* at 80-82, 89-92, 103-105, 109-112.

Q: Then is it also the truth that you in fact did commit murder?

A: No, it's not.

Q: That you did in fact kidnap somebody?

A: No.

Q: You made a deal to help yourself, right?

A: Yes.

*Id.* at 133.  Tellingly, Arthur was not questioned about making a stop at the home of Deiseroth and Mayhugh.  During closing arguments, Appellant's counsel vigorously challenged Arthur's credibility.  N.T., Trial, 1/31/91, at 49-56.

At the conclusion of trial, a jury found Appellant and Cowfer guilty of first-degree murder, robbery, theft by unlawful taking or disposition, kidnapping, and conspiracy.[2]  The jury acquitted Zawodniak.  On June 17, 1991, the trial court sentenced Appellant to life in prison without parole.  On October 21, 1992, this Court affirmed the judgment of sentence.  On June 25, 1993, our Supreme Court denied his petition for allowance of appeal.  Appellant's judgment of sentence became final on September 23, 1993, ninety days after our Supreme Court denied allowance of appeal.  *See* 42 Pa.C.S.A. § 9545(b)(3); United States Supreme Court Rule 13.

Almost four years later, Appellant filed his first PCRA petition, asserting that he was entitled to relief due to newly discovered evidence in the form of letters written by Cowfer in 1991 and 1997 and addressed to Appellant's trial counsel wherein Cowfer alleged that Appellant was innocent.  Oral argument was scheduled in connection with the amended petition for December 7, 1998.  However, on that date, Appellant voluntarily withdrew his petition.  The lower court specifically noted that Cowfer had been transported to the Butler County Prison and was available for the hearing.  PCRA Order, 12/9/98.

---

[2]  18 Pa.C.S.A. §§ 2502(a), 3701(a)(1)(i), 3921(a), 2901(a)(3), 903(a), respectively.

Several years later, Appellant *pro se* filed a second PCRA petition on July 2, 2004, which counsel amended on July 26, 2004. In the amended petition, Appellant once again referenced the 1991 and 1997 letters from Cowfer. Counsel once again amended the second PCRA petition on November 17, 2004, including a new "affidavit" from Cowfer dated September 23, 2004. In the affidavit, Cowfer stated that he and Arthur were the individuals who went into the residence of Mayhew a few hours after the death of Mr. Landry. According to Cowfer's affidavit, Zawodniak, Sopo and Appellant remained in the car. A hearing on the timeliness of the petition was subsequently held on January 27, 2006. Following the submission of post-hearing briefs by the parties, the PCRA court denied Appellant's second PCRA petition on July 12, 2006. On appeal to this Court, Appellant argued, *inter alia*, that the Cowfer affidavit satisfied the timeliness exception in the Act. This Court summarized and disposed of this claim as follows:

> At trial, Commonwealth witnesses Leonard Mayhugh and Carrie Deiseroth testified that Cowfer arrived at their residence on the morning after the murder and confessed to his participation in the crime. They further testified that another young man, who was never identified at trial, accompanied Cowfer, and that Cowfer's statements implicated that person in the crime as well. Appellant asserts that, since he was the only male co-defendant on trial with Cowfer, "[t]he implications drawn from this testimony [were] that it was [Appellant] who was present at the time of Cowfer's meeting with Mayhugh and Deiseroth." However, Appellant received an affidavit from Cowfer, dated September 23, 2004, which identified co-conspirator Arthur McClearn as the person who accompanied Cowfer that morning. Indeed, the affidavit also stated that Appellant, Sopo, and co-defendant Zawodniak, waited for Cowfer and [Arthur] in a car outside of the residence.

- 11 -

> Appellant baldly asserts that the prosecutor deliberately withheld the name of the "unidentified" man, in violation of **Brady v. Maryland**, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215, (1963) and led the jury to believe that Appellant was the person that accompanied Cowfer and silently agreed to complicity in the crime.
>
>   . . . .
>
> Here, Appellant has failed to demonstrate that he could not have uncovered this information earlier through the exercise of due diligence.  Appellant filed a previous PCRA petition in September of 1997, based on information Cowfer provided to him in a letter, which contradicted the Commonwealth's version of the crime.  The trial court scheduled a December 7, 1998 evidentiary hearing on Appellant's petition, and Cowfer was transferred to the trial court for the purpose of testifying on Appellant's behalf.  However, Appellant voluntarily withdrew his petition prior to the evidentiary hearing.  Although the information in the present affidavit is somewhat distinct from that provided in Cowfer's previous letter, Appellant had the opportunity to question Cowfer at the hearing regarding all of the events surrounding the murder of Landry, but he declined to do so.  Therefore, Appellant has not proven that he could not have discovered this information earlier.

**Commonwealth v. Vogt**, No. 1376 WDA 2006, unpublished memorandum, at *9-10 (Pa. Super. filed October 24, 2007) (footnote omitted).  We affirmed the denial of relief.  Discretionary review in the Supreme Court of Pennsylvania was thereafter denied on April 8, 2008.

On April 14, 2008, Vogt filed a *pro se* petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Pennsylvania wherein he challenged his state court convictions.  On January 8, 2010, the petition was denied as untimely.  **Vogt v. Coleman**, 2010 WL 126144 (W.D. Pa. 2010).  Since that time, however,

he has filed multiple motions for relief from judgment pursuant to Fed.R.Civ.P. 60(b), with his latest filing being submitted on April 8, 2021.

On October 22, 2010, Appellant *pro se* filed his third PCRA petition, asserting that he was in possession of newly discovered evidence. Specifically, he alleged that on August 27, 2010, he was informed that Zawodniak had provided an affidavit proclaiming his innocence. *See* PCRA Petition, 10/22/10, ¶¶ 5-6. Appellant asserted:

> This affidavit was provided after a **volunteer assistant** used a paid service on the internet to locate Zawodniak and found her grudgingly willing to discuss the case. Prior to that I'd been unable to locate [Zawodniak], as I had no idea where she was. In fact, for more than ten years I believed she had passed away, as that was represented to me by a trusted source. . . . **My assistant** also found Michael Sopo who represented to her that he knew I had nothing to do with the crime and that he was coerced into testifying against me, but he has failed to provide an affidavit.

*Id.* at ¶ 6 (emphasis added). The assistant later was identified as Tricia Holfelder ("Holfelder"). The purported handwritten Zawodniak affidavit provided that: (1) Appellant was intoxicated on the night of Mr. Landry's death; (2) Appellant sprained his ankle and could barely walk on it; (3) Cowfer, Arthur and Mr. Landry went to look at the fishing hole; (4) Appellant got sick in the car and Zawodniak shoved him outside; (5) Appellant laid on the ground outside of the car; (6) Zawodniak fell asleep and woke up to the sound of something being slammed against the roof of the car; (7) Appellant crawled back into the car at that time and he was still drunk; and (8) Appellant was in and out of consciousness until the group dropped off Zawodniak. *See*

Zawodniak Affidavit, 8/25/10, attached as Exhibit A to Appellant's Third PCRA Petition. Curiously, the Zawodniak affidavit was notarized by Holfelder, Appellant's assistant. Also attached to the petition as an exhibit was Holfelder's typewritten statement dated September 14, 2010:

> **Approximately August of 2009, I started assisting [Appellant] with some of the clerical and other paperwork regarding his habeas petition after seeing the clear constitutional violation that occurred in his trial. I took it upon myself to look for the parties involved in the case. I did try finding the parties through regular methods and utilized search engines such as google.com.** I was never been able to locate the parties until on or about, Saturday August 8, 2010. I found a service called Intelius which is a pay service that is used to locate people. **After paying the fees I found an address and phone number for Margaret Zawodniak [sic]. I called the number and Ms. Zawodniak was quite difficult and said she has not talked about the case to anyone over the years, not even her family.** She said that she always refused to talk to anyone when contacted. After further conversation with Ms. Zawodniak she stated that [Appellant] did not have any problems with Mr. Frank Landry and that on the night of Mr. Landry's death [Appellant] was extremely intoxicated and was passed out most of the time. Ms. Zawodniak said that [Appellant] had hurt his ankle quite badly to the point she thought it was broken. She also stated to me that when the parties went to the mine Mr. Cowfer, [Arthur] and Mr. Landry went off together while [Appellant] stayed in the car with her until she pushed him outside when he started to vomit. **She finally agreed to make a written statement and did so on August 25, 2010.**

Holfelder Statement, 9/14/10, attached as Exhibit B to Appellant's Third PCRA Petition (emphasis added).

Moreover, Holfelder also stated that she located Sopo on an internet site and contacted him. She stated that "he was reluctant to talk to me about the topic. He stated to me that his testimony at trial was coerced and he was told

- 14 -

that he would go to jail forever whether he committed the crime of not if he did not testify the way he was instructed." *Id.* According to Holfelder's statement, Sopo confirmed that Appellant was intoxicated, hurt his ankle and was having trouble walking. She then wrote that "Mr. Sopo also stated to me that he was 100% sure that [Appellant] did not go into the home of Carrie Dieseroth and Leonard Mayhugh with Walter Cowfer on the night of Mr. Landry's death." *Id.* According to Holfelder, Sopo stated that he "knew that Cowfer and [Arthur] were involved in the death of Mr. Frank Landry and not [Appellant]." *Id.* She wrote that Sopo stated that he would be willing to make a written statement but had failed to do so. In this written statement Holfelder further averred that she sent letters to Mayhugh and Deiseroth but they had not responded. Significantly, there was no mention of any attempt to contact Arthur, even though she had taken it upon herself to locate the parties involved. The PCRA court dismissed Appellant's third petition as untimely on November 16, 2010. On appeal, we affirmed the denial of relief. *See Commonwealth v. Vogt*, 37 A.3d 1238 (Pa. Super. filed October 19, 2011) (unpublished memorandum).

On August 22, 2012, Appellant *pro se* filed a fourth PCRA petition, raising a claim under *Miller v. Alabama*, 132 S. Ct. 2455 (U.S. 2012). On January 3, 2013, the lower court dismissed the petition without a hearing because *Miller* did not apply as Appellant was not a minor at the time of Mr. Landry's murder and Appellant could not satisfy the PCRA's timeliness exceptions. On October 4, 2013, this Court affirmed the denial of post-

conviction relief. **See Commonwealth v. Vogt**, No. 188 WDA 2013, 2013 WL 11253321 (Pa. Super. filed October 4, 2013) (unpublished memorandum).

Several years later, on January 23, 2017, just **nine days after** Arthur died,[3] [Appellant] filed a Rule 60(b) motion in the District Court wherein he argued that he was entitled to relief pursuant to the decision in **Dennis v. Secretary Pennsylvania Department of Corrections**, 834 F.3d 263 (3d Cir. 2016). He requested that his case be reopened and that his claim that the prosecution withheld **Brady** evidence—the identity of the unidentified male who accompanied Cowfer into the residence of Deiseroth and Mayhugh— be re-examined. This motion was denied on May 25, 2017 and reconsideration was denied on June 8, 2017.

Four days later, on June 12, 2017, Appellant *pro se* filed the instant, his fifth, PCRA petition, asserting that he came into receipt of new evidence in the form of an entirely typewritten letter dated October 23, 2016 purportedly authored by Arthur. In the letter—addressed to "Mr. Vogt"—Arthur purportedly recanted his testimony at trial, stating, *inter alia*, that: (1) "They made me [Arthur] help convict you"; (2) Appellant did not go to the quarry when he [Arthur] and Cowfer killed "Frank"; (3) Appellant was passed out in the car; (4) when he [Arthur] and Cowfer returned to the car, Appellant was laying on the ground; (5) he [Arthur] helped Appellant back into the car; and (6) he [Arthur] lied when he said that Appellant had anything to do with killing

---

[3] Arthur died on January 14, 2017. R.R. 270.

"Frank." Arthur's Statement, 10/23/16, Reproduced Record (R.R.) at 222. The name "Art" was typed at the bottom of the page. *Id.* Interestingly, the letter did not state that Arthur was the one who accompanied Cowfer into the residence of Deiseroth and Mayhugh. On June 23, 2017, the PCRA court dismissed the petition. Appellant appealed to this Court. We vacated the PCRA court's order and remanded the case to the lower court for consideration of the timeliness of Appellant's petition. *See Commonwealth v. Vogt*, 188 A.3d 583 (Pa. Super. filed March 28, 2018) (unpublished memorandum).

While his appeal from the dismissal of this fifth PCRA petition was pending in this Court, Appellant filed a civil action in the District Court against the Secretary of the Department of Corrections and the mailroom employees at SCI-Fayette wherein he alleged that his due process rights under the Fourteenth Amendment, Due Process rights under the Fifth Amendment, his right to access the courts under the First and Fourteenth Amendments and his First Amendment rights were violated when his alleged letter from Arthur was rejected by the prison officials without notice to him in October 2016. *See Vogt v. Wetzel*, No. CV 17-1407 (W.D. Pa 2017). The District Court ultimately dismissed the petition for failure to state a claim. *Vogt v. Wetzel*, No. CV 17-1407, 2018 WL 3388484, at \*1 (W.D. Pa. July 12, 2018).

On appeal, the United States Court of Appeals for the Third Circuit vacated the order dismissing Appellant's Fourteenth Amendment procedural due process claim and directing the District Court to address it at summary judgment or trial, as appropriate. The court also vacated the order dismissing

- 17 -

the access to the courts claim as unripe with instructions to stay that claim while this PCRA litigation proceeded. ***See Vogt v. Wetzel***, 8 F.4th 182, 187 (3d. Cir. 2021).[4] The District Court was also instructed to resolve the free speech claim.

On January 7, 2019, Appellant's counsel filed an amended Fifth PCRA petition. In the Amended petition, Appellant's prior filings were incorporated, including the October 23, 2016 typewritten letter purportedly authored by Arthur. Also incorporated was a July 24, 2017 handwritten letter from Heidru Maureschat ("Maureschat") which stated that she sent a letter to Appellant in November 2016 that contained photographs. Maureschat Letter, 7/24/17, attached as Exhibit C to Appellant's Amended Fifth PCRA Petition. "Thinking about it later," she realized that she may have forgotten to put her return address on the envelope. *Id.* She then wrote that in **January 2017**, she asked Appellant if he ever received the photographs and he responded that he did not. Although he was supposedly notified by Maureschat in January 2017 that there was a problem with his mail, Appellant did not make inquiry about the status of his mail with the prison until April 17, 2017. ***See*** Exhibit D attached to Appellant's Amended Fifth PCRA Petition.

---

[4] The authenticity of Arthur's recantation letter mailed to Appellant was not at issue on appeal before the Third Circuit.

As the amended PCRA petition also incorporated Appellant's brief on the timeliness of his petition, an April 2, 2018 statement from Phyllis Vogt, Appellant's mother, was included, providing as follows:

> I cannot recall an exact date, but sometime around 2005 my son [(Appellant)] requested that I try to find Arthur McClearn. [Appellant] wanted some information concerning an appeal he was planning to file. It was something that would not have negatively impacted [Arthur] or his credibility. I found the address on the internet and went to visit [Arthur]. He came to the door and, on learning my identity, was totally uncooperative and indicated by word and demeanor that he wanted nothing to do with me or [Appellant]. So I left. [Appellant] asked me at a later time if I could try to contact [Arthur] again. But I couldn't find his address then and felt it would be useless anyway based on his earlier responses.

Mrs. Vogt's Letter, 4/2/18. Appellant's father, William Vogt, also submitted a statement, indicating that he drove his wife [(Appellant's mother)] to Arthur's residence and waited in the vehicle. Mr. Vogt's Letter, 4/2/18. Mr. Vogt stated that "I saw [Arthur] come to the door. He and [Mrs. Vogt] exchanged words very briefly and then he went inside and closed the door. When she came back to the car, [Mrs. Vogt] was disappointed that [Arthur] refused to talk to her." *Id.*

On August 26, 2019, the PCRA court conducted a hearing on Appellant's Amended Fifth PCRA Petition, following which it determined the petition to be timely filed.[5] On March 8, 2021, the PCRA court held a hearing on the merits of the petition. Although Appellant's parents were present, Appellant did not

---

[5] During the pendency of the instant petition, Zawodniak passed away on March 8, 2020. R.R. at 273.

call them to the stand to testify on his behalf.  ***See*** N.T., Hearing, 3/8/21, at 3.

Appellant called to the stand Holfelder (now "Meade") to testify on his behalf.[6]  Meade testified to the making of the August 25, 2010 Zawodniak affidavit.  According to Meade, Zawodniak wanted to reach out to Appellant's family years prior but that she (Meade) did not "really know the details of that."  ***Id.*** at 14.  Meade further testified that she did not charge Zawodniak a fee for the notarization.  ***Id.*** at 18-19.  She testified that this was her first time meeting Zawodniak and that she never saw her after that day.  ***Id.*** at 19.  Meade stated that she "kind of felt for the Vogt family" and "was trying to help them."  ***Id.***  On cross-examination, Meade stated:

> Q: So the only way that Miss Zawodniak knew that you were a notary was because you're familiar with the Vogt family?
>
> A: Right.  She reached out to somebody.  I'm not sure who.  Wanted to make a statement.  So I went - - I don't even remember what the statement says.  I didn't - - you know, she wrote it.  I notarized it, and I left.
>
> Q: Did you let the Vogt family know that you had done this?
>
> A: I believe - - I don't want to make anything up.  I believe that everybody knew.  I believe.  **I didn't do this on my own**.  **I didn't reach out to go do this**.
>
> I don't remember exactly how the details went because it was a long time ago, but - - like I wouldn't have known her if - - she didn't randomly - - like I just went, and she wrote it down.  I notarized the statement.  That is it.  That is all that happened.

---

[6] Appellant failed to list Meade on the certification of witness as required by 42 Pa.C.S.A. § 9545(d)(1).

Q: All right. And after that statement was notarized, do you recall any conversations with Mr. and Mrs. Vogt - -

A: No, I just said, here's the statement. That's it.

Q: And when you said . . . here's the statement, you gave them a copy?

A: No, I - - well, they - - I gave the document so they could do what they needed to do with the - - I don't remember the details. This was so long ago. All I know is I went, she wrote that down, and I notarized the statement.

Q: And then what did you do with the statement?

A: I handed it over - - I - - I don't even remember. Like I could make something up, but I don't remember the details. It's so long ago. I got it in the hands of the Vogt family so they can do the paperwork.

Q: And was it the same day that she signed it?

A: I honestly do not know. . . . Like all I did was I went. She wrote it down. I notarized it, and that was it.

. . . .

Q: And you didn't make a copy for your records? Correct?

A: I probably - - yeah. I had copies of it. Do I have copies of it now? No.

Q: All right. So what was the purpose of you making a copy of the document?

A: I don't know. They needed copies. I don't know. You're asking me questions that I really don't remember. I don't know if I made a copy. I don't remember if I don't. know I don't have a copy.

. . . .

Q: Did the Vogts tell you why this statement was important?

A: I don't remember. This was a long time ago. I don't remember. I think there was a PCRA hearing or something or a paperwork filed. I don't know. I'm not part of the case. I literally just notarized the paper.

*Id.* at 21-25 (emphasis added).  According to Commonwealth Exhibit 1 introduced at the hearing, the Pennsylvania Department of Corrections "Visit History by Inmate" revealed that Meade, then Holfelder, visited Appellant on the following dates: October 13, 2008, January 1, 2009, March 29, 2009, July 19, 2009, January 1, 2010, April 22, 2010, September 24, 2010 and October 14, 2010. *Id.* at 3 (Commonwealth Exhibit 1).

Appellant next presented the testimony of Judson McClearn, Jr. ("J. McClearn"), the first cousin of Arthur.  Through introduction of Arthur's death certificate, it was established that Arthur died on January 14, 2017. According to J. McClearn, while Arthur was incarcerated for the murder, he would send J. McClearn typewritten letters.  N.T., Hearing, 3/8/21, at 29. J. McClearn was quick to add that Arthur would always write just "Art" on the bottom.  *Id.*

> Q: Okay.  Did he actually sign it in like a pen, or was it just a typed signature?
>
> A: I believe it was pen.
>
> Q: You think he wrote to you in pen?
>
> A: No. No. He typed it, but it seemed to me like it looked bigger from what I can remember.
>
> Q: Are you actually - - are you certain that that's how it was?
>
> A: I'm actually not certain, to tell you the truth.  I - - you know, it -- I do believe it was typed actually now - - now that I'm recollecting it.  It was many years ago, I believe it was just typed, all typed.

*Id.* at 29-30.  J. McClearn characterized his relationship with Arthur as estranged following Arthur's release from prison.  *Id.* at 30.

> Q: Okay. When he we was released from prison, did you still have communications with him in that format [typed]?
>
> A: Yeah - - writing?
>
> Q: Uh-huh.
>
> A: **No, I actually spoke with him a couple times, but not face to face.**
>
> Q: Okay.  Would you say your relationship to Art was close or estranged?  How would you describe it?
>
> A: I would say estranged.  But we also - - I mean we wrote because - - my family really just kind of disowned him, but he's still my cousin no matter what happened.
>
> Q: Okay. And how often would you say that you received letters from Art in the typed fashion?
>
> A: Two, three times a month.

*Id.* (emphasis added).

J. McClearn, however, could not locate any of these letters for purposes of the hearing.  *Id.*  According to J. McClearn, a woman reached out to him and asked if he had any knowledge of Arthur sending a letter to a prison.  *Id.* at 31.  J. McClearn testified that "Art[hur] did tell me that, that he had - - he wanted to get reprieve and tell the truth about [Appellant]."  *Id.*  When asked when he was made aware of this letter, J. McClearn stated he "really can't remember" and "believe(d) it was after Art[hur] passed."  *Id.* at 31-32.  J. McClearn testified that he stopped receiving letters from Arthur in 2013 or 2014 "because he had moved closer to us and stuff like that.  So we started

talking on the phone more." *Id.* at 35. J. McClearn, however, testified that he did not know the town where Arthur lived. *Id.* He stated that he only saw Arthur twice after Arthur was released from prison. *Id.*

When asked where Arthur was living in 2016, J. McClearn initially did not recall but then stated that Arthur was in a nursing home at that time. *Id.* However, J. McClearn did not know the location of the nursing home. *Id.* at 36. Although he previously testified that he stopped receiving letters from Arthur in 2013 or 2014, he later testified that Arthur told him about the letter to Appellant *in a letter* that he (Arthur) sent to J. McClearn in 2015. *Id.* at 38. He also told the court that he "believed" that Arthur sent him letters from the nursing home. *Id.* at 36. Although he claimed to have received these letters, he stated that he never saw Arthur's signature. *Id.* at 37. J. McClearn neither attended Arthur's funeral, nor did he receive any of his belongings. *Id.* at 36. The following exchange then occurred with respect to whether J. McClearn ever provided any written statements.

> Q: There was a certification that was filed in this matter by [Appellant's] attorney wherein she indicated that she had attempted to contact you on several occasions to obtain a certification from you, but the efforts were unsuccessful. How did anyone reach out to you with respect to [Appellant's] defense?
>
> A: The only person that's ever reached out to me was the Mary lady and her.
>
> Q: And how did [Appellant's counsel] reach out to you?
>
> A: Via phone. Or Facebook I do believe.
>
> Q: All right. Did you write out a statement?

A: I believe I did.

Q: Who did you give that statement to?

A: I - - maybe I - - maybe I didn't write out a statement. I thought I wrote something down or something with [Appellant's counsel], but maybe I didn't write down a statement.

*Id.* at 40-41.

Finally, Appellant testified on his own behalf. He stated that he discovered Arthur's letter on May 17, 2017 when an inter-department mail envelope was placed in his cell. *Id.* at 48. Appellant testified that he had written to mail recovery centers looking for lost mail after he failed to receive a letter and photographs sent to him by his friend, Maureschat. *Id.* at 48-49. He claimed that the envelope that contained Arthur's letter was confiscated during a search of his cell. *Id.* at 52.

Appellant identified Exhibit "H" as his sworn affidavit dated April 3, 2018 wherein he stated, in relevant part, that he had tried to contact Arthur "many times over more than two decades through various family members and friends" and that "occasionally people declined to help, but when he was actually contacted he refused to speak on the matter, and typically quite rudely." *Id.* at 53-54. He further averred in his affidavit that "prior to receiving the recantation letter I did not know [Arthur's] whereabouts and had no reason to believe he had a change of heart since my last attempts pertaining his willingness to speak with me or anyone else on the matter." *Id.*

When asked if he recalled the events leading up to the murder, Appellant responded "[u]m, not very much reliable." *Id.* at 58. This exchange followed.

Q: Okay. And you've had a chance to review both the affidavit that was offered and admitted from Miss Zawodniak as well as Arthur's recantation letter? Is that right?

A: Yes.

Q: Okay. And from what you do remember from that night, are those events or are those recitations accurate?

A: Yes they are.

*Id.* Appellant subsequently testified:

I would like to point out that the affidavit and the letter match each other in content for the events of that night, and they are certainly more accurate with my recollection of what happened compared to what was testified to at trial.

*Id.* at 67. When asked whether anything in Arthur's letter stood out to him to cause him to believe that Arthur had personal knowledge of the information contained within the letter, Appellant responded, "Yes. One of the things I noticed was that the author knew that [Arthur] did not know me prior to that. I don't think that is public knowledge anywhere. I'm not sure of that." *Id.* at 58. Appellant then added: "Another thing is [Arthur] had referred to Walter Cowfer as Sherm. Only close friends of him referred to him as that." *Id.* Appellant thereafter identified a photocopy of an envelope with his name, address and the words "Legal mail" handwritten on the front of it that he claimed contained Arthur's letter. *Id.* at 65-66. The envelope contained no return address.

Near the conclusion of his testimony on direct examination, Appellant stated that with respect to Arthur's trial testimony, "I suspected [Arthur] was

lying, which is why I kept trying to contact him, but he would never respond to it." *Id.* at 68.

On cross-examination, Appellant acknowledged that he typed the letter to the Mail Recovery Center and his April 3, 2018 affidavit on a word processor located in the library at the prison. *Id.* at 69. He stated that all inmates can utilize the word processor. *Id.* at 70. When asked about the averments in the affidavit with respect to attempts made to contact Arthur, Vogt testified that "nobody ever gave me his address." *Id.* He acknowledged that his mother had visited Arthur on one occasion to speak with him and that he believed Holfelder (Meade) might have contacted him. *Id.* He noted that "just a bunch of people over the years" had tried to reach Arthur. *Id.*

> Q: Those individuals that did make contact with [Arthur], how did they contact him? Was it in person? Was it by telephone?
>
> A: I believe my mother visited him. Other people, I don't know.
>
> Q: They didn't explain to you how they located him?
>
> A: No. A lot of them never even said they got with him at all. They tried to find his address and couldn't.
>
> Q: But your mother found it? She found his address?
>
> A: Yes.
>
> Q: How did she find his address?
>
> A: She did not tell me that.
>
> Q: You didn't ask her?
>
> A: No.
>
>  . . . .

Q: Why were you attempting to contact him for two decades?

A: Because I believe he was lying at my trial.

Q: And what happened when your mother actually spoke with him?

A: I'm not sure, but he was not cooperative.

Q: Well, you've been trying to reach him for two decades. Didn't you ask her some follow-up questions such as where is he living? Who is he living with? What did he say about my case?

A: I did not. I did not. If he doesn't want to talk or - - if he doesn't want to talk about it, I can't make him, you know. I wasn't trying to force myself on him. If he wanted to talk, I wanted to hear it, but - -

Q: So you weren't interested in knowing where he lived?

A: No.

*Id.* at 71-72. Appellant stated that his mother visits him at the prison "once every couple months or so." *Id.* at 72. He was then asked whether he recalled a visit to the prison that she made on July 10, 2017 shortly after the discovery of Arthur's letter and the filing of his fifth PCRA petition. *Id.* He stated that he did not recall that visit specially and did not know whether he told her about the letter. *Id.*

Q: You didn't tell her that you're pursuing a new appeal based on this letter that you received from Arthur?

A: I don't believe I did. No.

    . . . .

Q: Did you ask your mother if [Arthur] was living in Pittsburgh?

A: I don't believe so.

*Id.* at 72-73.

- 28 -

Additionally, Appellant testified that his friend Dawn Bruner ("Bruner") sent him an e-mail on April 19, 2017 wherein she advised him that Arthur had passed away. *Id.* at 74. Although he claimed that Bruner had been trying to find Arthur, he did not recall if he told her that his mother had actually located and met with Arthur. *Id.* at 74-75. Appellant could not explain how or where his friends and family searched for Arthur. *Id.* at 76.

Although he testified that the Zawodniak affidavit and Arthur's letter were "certainly more accurate with my recollection of what happened compared to what was testified to at trial," Appellant stated on cross-examination that he *did not* remember anything "beyond leaving Arthur McClearn's residence" and that the next thing he remembered was "being in a motel in Kentucky." *Id.* at 76-77.

> Q: [S]o it's your testimony that you have no recollection of what happened at the quarry?
>
> A: Yes.
>
> Q: And you indicated that you always thought [Arthur] was lying? Correct?
>
> A: Yes.
>
> Q: But you have no recollection of what actually happened? Correct?
>
> A: Correct.
>
> Q: So why would you believe he would be lying?
>
> A: Because it's just not in my nature to do what he was saying I did. But beyond that, earlier that night I hurt my ankle like really bad. My foot was swollen and I couldn't get a shoe on because I

couldn't walk due to intoxication. It didn't seem likely that after that I would be doing what he testified to at trial.

Q: But that - - it doesn't seem likely? Correct?

A: Yeah.

Q: But you don't know because you don't remember?

A: That's true.

*Id.* at 77.

Following the conclusion of the hearing, both parties submitted post-hearing briefs for the PCRA court's consideration. Thereafter, on July 14, 2021, the PCRA court admitted into the record for the court's consideration Appellant's *pro se* "Motion for Judicial Notice That Arthur McClearn was Most Recently in a State Correctional Facility in September 2010, and Mail Policy DCADM 803 was Changed to Disallow Mail Without a Return Address in October 2015." Ultimately, on September 29, 2021, the PCRA court dismissed Appellant's instant—his fifth—PCRA petition. Appellant *pro se* appealed. Both Appellant and the PCRA court have complied with Pa.R.A.P. 1925.[7]

On appeal,[8] Appellant presents six issues for our review, reproduced verbatim below.

_____

[7] During the pendency of this appeal, Appellant's federal litigation continued unabated. *See*, *e.g.*, *Vogt v. Coleman*, No. CV 08-530, 2021 WL 5040424 (W.D. Pa. Oct. 29, 2021).

[8] "In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination 'is supported by the record and free of legal error.'" *Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014) (quoting *Commonwealth v. Rainey*, 928 A.2d 215, 223 (Pa. 2007)).

[I.] The Appellant respectfully submits that the Trial Court committed an error of Law when it denied and dismissed the Appellant's Second Amended Petition for Post-Conviction Relief Pursuant to the Post Conviction Relief Act and determined that the evidence presented was not credible.

[II.] The Appellant respectfully submits that the Trial Court committed an error of Law when it denied and dismissed the Appellant's Second Amended Petition for Post-Conviction Relief Pursuant to the Post Conviction Relief Act and determined that the Zawodniak affidavit was inadmissible as to hearsay.

[III.] The Appellant respectfully submits that the Trial Court committed an error of Law when it denied and dismissed the Appellant's Second Amended Petition for Post-Conviction Relief Pursuant to the Post Conviction Relief Act and determined that [Arthur's] letter was not able to be authenticated and therefore inadmissible as to hearsay.

[IV.] The Appellant respectfully submits that the Trial Court committed an error of Law when it denied and dismissed the Appellant's Second Amended Petition for Post-Conviction Relief Pursuant to the Post Conviction Relief Act and failed to take judicial notice and thus, failed to take into consideration the United States Court of Appeals for the Third Circuit's precedential decision filed on August 9, 2021 at case number 18-2622.

[V.] The Appellant respectfully submits that the Trial Court committed an error of Law when it denied and dismissed the Appellant's Second Amended Petition for Post-Conviction Relief Pursuant to the Post Conviction Relief Act and determined that there was no evidence presented that the Zawodniak affidavit was a statement against interest or that it was unsupported by corroborating circumstances that clearly indicate its trustworthiness.

[VI.] The Appellant respectfully submits that the Trial Court committed an error of Law when it denied and dismissed the Appellant's Second Amended Petition for Post-Conviction Relief Pursuant to the Post Conviction Relief Act and determined that the circumstantial evidence presented was not sufficient to authenticate [Arthur's] letter.

Appellant's Brief at 7-8. For ease of discussion, we distill his claims into two distinct issues.[9] First, Appellant challenges the PCRA court's evidentiary rulings relating to the admissibility of Arthur's typewritten recantation letter and the Zawodniak affidavit that Appellant seeks to introduce into evidence in support of his after-discovered evidence claim on collateral appeal. Second, Appellant claims that the PCRA court erred when it failed to *sua sponte* take judicial notice and consider the Third Circuit decision filed on August 9, 2021 in connection with his civil action against the Secretary of the Department of Corrections and the mailroom employees at SCI-Fayette. We address them in turn.

Preliminarily, we note that the parties and the PCRA court agree that Appellant's instant PCRA petition is timely because Appellant alleged and proved that the facts upon which his claim is predicated were unknown to him and could not have been ascertained by the exercise of due diligence.[10] **See** 42 Pa.C.S.A. § 9545(b)(1)(ii). Separately, it is undisputed that Appellant filed the instant petition within sixty days of the date the claim could have been

_____

[9] Appellant himself combined issues one, two, three, five and six in the argument section of his brief.

[10] The "new facts" exception at Section 9545(b)(1)(ii) does not require any merits analysis of an underlying after-discovered-evidence claim. **Commonwealth v. Bennett**, 930, A.2d 1264, 1271-72 (Pa. 2007).

presented. *See* 42 Pa.C.S.A. § 9545(b)(2).[11] Accordingly, the PCRA court properly exercised jurisdiction over Appellant's PCRA petition *sub judice*.

It is settled that, once jurisdiction is established, a substantive claim alleging after-discovered evidence pursuant to 42 Pa.C.S.A. § 9543(a)(2)(vi) may be presented. ***Commonwealth v. Brown***, 111 A.3d 171, 176 (Pa. Super. 2015), ***appeal denied***, 125 A.3d 1197 (Pa. 2015); ***see*** 42 Pa.C.S.A. 9543(a)(2)(iv) (explaining that to be eligible for relief under the PCRA, petitioner must plead and prove by preponderance of the evidence that conviction or sentence resulted from, *inter alia*, unavailability at time of trial of exculpatory evidence that has subsequently become available and would have changed outcome of trial if it had been introduced).

As we have stated repeatedly:

> To obtain relief based on after-discovered evidence, [an] appellant must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

> The test is conjunctive; the appellant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted. Further, when reviewing the decision to grant or deny a new trial on the basis of after-discovered evidence, an appellate court is to determine

---

[11] Section 9545(b)(2) was amended, effective December 24, 2018, to extend the time for filing from sixty days of the date the claim could have been presented to one year. The amendment applies only to claims arising on or after December 24, 2017. Thus, this amendment does not apply to Appellant's PCRA petition because it was filed prior to the amendment's effective date.

whether the PCRA court committed an abuse of discretion or error of law that controlled the outcome of the case.

***Commonwealth v. Foreman***, 55 A.3d 532, 537 (Pa. Super. 2012) (quotation marks, brackets, and citations omitted).

With the foregoing principles in mind, Appellant claims that on May 17, 2017, he received an envelope, postmarked October 25, 2016, containing a typewritten letter, dated October 23, 2016, from Arthur.  According to Appellant, his May 17 receipt of the letter occurred approximately four months after the purported author of the letter, Arthur, had passed away on January 14, 2017.  The letter provided:

October 23, 2017

Mr. Vogt,

They say I gotta go back and make amends for past wrongs before I can put the past completely behind me.  Hope they are right and this helps ease my conscience.  I checked online and found you.  Saw your appeal or something.  I wish that would have worked for you so I didn't have to do this.  It's me Art McClearn!  Please keep reading this, because if I can help I will.  You will never know how sorry I am that things worked out the way they did.  I don' know what you did to piss those people off but they <u>made</u> me testify the way I did.  I did tell them the truth but they wouldn't accept it and kept at me until they liked what I said.  I didn't know you, so it was easier to go through with it, but you have to understand!  It was to save my life!  They made me help convict you.  It was the only way to avoid the death penalty.  It says online that you don't remember much.  I'm not surprised you were really wasted.  The fact is you did not go to the quarry where me and Sherm killed Frank.  You were passed out in the car.  Then when we came back you were laying on the ground outside the car.  Sherm wanted to leave you there, said he wasn't babysitting.  I helped you get up and put you back in the car.  Can't believe Sherm did that.  Do you know he talked about going to the police and telling them you killed Frank right away?  He didn't think they'd believe it then.  I think he may have called

- 34 -

them from his friend's or somewhere. Maybe that's why they were so focused on you to blame. I don't know. I lied when I said you had anything to do with killing Frank. You did not. I'm ready to tell the truth. I need to tell the truth. I know you may be mad and I wouldn't blame you, but I'm really trying to make it right, now. I'm sorry it has taken so long. I don't feel comfortable giving you my house address there so you'll have to have your lawyer contact me on Facebook if you think I could help with an appeal. I'm willing to testify to the truth now. I really am sorry, Steve!

Art

Letter, 10/23/17 (emphasis in original). Referencing the purported letter from Arthur, Appellant points out that Arthur recanted his trial testimony and Appellant, therefore, is entitled to a new trial. The PCRA court denied relief, concluding that the alleged recantation was inadmissible because Appellant failed to authenticate the letter properly. It is that ruling that Appellant challenges on appeal. In so doing, he asserts that the letter was authenticated and is admissible under hearsay exception for statements against interest, Pa.R.E. 804(b)(3).[12]

_____

[12] Rule 804 provides in pertinent part:

**(b) The Exceptions.** The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

. . . .

(3) *Statement Against Interest.* A statement that:

(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to

*(Footnote Continued Next Page)*

- 35 -

When we review a PCRA court's ruling on admission of evidence,

> decisions on admissibility are within the sound discretion of the [PCRA] court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Talley*, 236 A.3d 42, 55 (Pa. Super. 2020), *aff'd but criticized*, 265 A.3d 485 (Pa. 2021). With respect to authentication, it is codified in Pennsylvania Rule of Evidence 901, which provides in pertinent part that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Pa.R.E. 901(a). That rule also provides that the testimony of a witness with personal knowledge that a matter is what it is claimed to be may be sufficient to authenticate or identify the evidence. Pa.R.E. 901(b)(1); *id.* at *cmt.* (citing *Commonwealth v. Hudson*, 414 A.2d 1381 (Pa. 1980)); *Commonwealth*

_____

invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(b)(3).

*v. Koch*, 39 A.3d 996 (Pa. Super. 2011) *aff'd by an equally divided Supreme Court*, 106 A.3d 705 (Pa. 2014); *In the Interest of F.P.*, 878 A.2d 91, 93-94 (Pa. Super. 2005).

A document may be authenticated by direct proof and/or by circumstantial evidence. *Commonwealth v. Brooks*, 508 A.2d 316, 318 (Pa. Super. 1986). "Proof of any circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing." *Id.* at 319 (quoting, *inter alia*, McCormick, Evidence § 222). Where there is a question as to any writing, "the opinion of any person acquainted with the handwriting of the supposed writer" is relevant for that purpose. 42 Pa.C.S.A. § 6111(1). Rule 901(b) provides that "[a] non[-]expert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation," is competent evidence. Furthermore, circumstantial evidence may be sufficient to authenticate a document. *See* McCormick, Evidence, *supra* at §§ 219-21 (discussing circumstantial evidence and cases cited therein); *see e.g.*, *Commonwealth v. Nolly*, 138 A. 836 (Pa. 1927) (letters authenticated by contents known only to sender and recipient); *Commonwealth v. Bassi*, 130 A. 311 (Pa. 1925) (finding unsigned letter authenticated by defendant's nickname written on it, along with contents indicating knowledge of matters familiar to both defendant-sender and witness-recipient).

Here, based upon our review of the entire record, as detailed above, we cannot agree with Appellant's argument that the PCRA court abused its

discretion in disallowing the recantation letter purportedly authored by Arthur.

As a result, we agree with the PCRA court that Appellant is not entitled to

relief on his after-discovered evidence claim based on the recantation letter.[13]

As the Commonwealth astutely observes, because the letter at issue

was entirely typewritten, no one could testify to its authorship based upon

handwriting. Nonetheless, Appellant presented testimony to establish the

letter's authenticity. The PCRA court explained:

> There is not any direct proof to authenticate that the document at
> issue actually was written by Arthur []. First, the one-page letter
> [Appellant] alleges he received is typewritten, including the
> signature. Second, there is not a return address on the envelope
> the letter allegedly was in to indicate where it was sent from.
> Moreover, the original envelope is not available for inspection, and
> only a photocopy was produced.
>
> The [c]ourt further finds the circumstantial evidence presented is
> not sufficient to authenticate the typewritten letter. [McClearn's]
> testimony regarding the format of the signature on the letters he
> received from Arthur [] was conflicting, as he initially stated the
> signature was in pen, and then stated it was typed, and then said
> he was not certain, before settling on that it was typed as his
> answer. Further, [McClearn] stated he received a letter in 2015
> from Arthur [] that referenced Arthur [] had sent a letter to a
> prison. However, the envelope from the letter [Appellant]
> allegedly received was postmarked October 25, 2016. Moreover,
> [McClearn] testified he had stopped receiving letters from Arthur
> [] in 2013 or 2014. For these reasons, the [c]ourt finds that the
> testimony of [McClearn] is too indeterminate to support
> authentication of the document at issue. Additionally,
> [Appellant's] testimony about statements in the letter that he did

_____

[13] While recantation evidence is often highly unreliable, a PCRA court must, as
it did here, assess the credibility of the recantation and its significance in light
of the evidence as a whole before it can deny PCRA relief on the ground that
the claim lacks merit. ***Commonwealth v. D'Amato***, 856 A.2d 806, 825 (Pa.
2004); ***Commonwealth v. Williams***, 732 A.2d 1167, 1180-81 (Pa. 1999).

not believe were public knowledge are inadequate to indicate the trustworthiness of the letter.

PCRA Court Opinion, 9/29/21, at 10 (record citations omitted).

We agree with the PCRA court's foregoing findings, which fully are supported by the record. Instantly, as outlined earlier, J. McClearn's testimony in support of Appellant's effort to authenticate the letter was insufficient as it was inconsistent and incredible. J. McClearn described his relationship with Arthur as estranged, speaking with Arthur a couple of times, never face-to-face, after Arthur's release from prison. J. McClearn then seemingly contradicted himself on cross-examination, stating that he saw Arthur twice upon Arthur's release from prison. J. McClearn did not know where Arthur resided. He believed Arthur was in a nursing home in 2016, but did not know where or for how long. Additionally, J. McClearn did not attend Arthur's funeral or receive any of his possessions. Yet, despite their limited contact, J. McClearn claimed that Arthur would send him typewritten letters two to three times per month until 2013 or 2014, following his release from prison. J. McClearn further claimed that the letters **stopped** because Arthur had moved closer to family, but their communication **resumed telephonically**. Once again contradicting himself, J. McClearn claimed that he specifically remembered that Arthur told him about the **October 23, 2016** letter to Appellant in a letter that Arthur had sent to J. McClearn in **2015**. The contradiction continued, when J. McClearn stated that he believed Arthur sent him letters from the nursing home.

Despite J. McClearn's claim that he received letters from Arthur, he never observed Arthur's signature. According to J. McClearn, Arthur only sent typewritten, and unsigned, letters until 2016 when he was in a nursing home. Tellingly, even though J. McClearn specifically and clearly recalled certain dates and years in question, he was unable to recall whether he himself had provided a written statement prior to the 2021 evidentiary hearing.[14]

Next, Appellant's own testimony to authenticate the letter did not fare any better. When asked whether anything in Arthur's letter stood out to him to cause him to believe that Arthur had personal knowledge of the information contained within the letter, Appellant responded, "Yes. One of the things I noticed was that the author knew that [Arthur] did not know me prior to that. I don't think that is public knowledge anywhere. I'm not sure of that." Appellant continued stating, "[a]nother thing is he had referred to Walter Cowfer as Sherm. Only close friends of him referred to him as that." Appellant completely ignored the fact that Arthur testified at trial that he had known Cowfer for one and one-half months prior to the murder and that their acquaintance centered around drinking. Thus, Cowfer could hardly be considered a stranger. He also ignored the fact that Arthur testified at trial that he only met Appellant on the evening in question.

Appellant intimated that Arthur eluded him, and all of his friends and family actively working on his behalf over the past two decades. When

---

[14] The Commonwealth posits that the recantation letter was fraudulent. Commonwealth's Brief at 42, n.12.

pressed for details on how attempts to contact Arthur were made, he could not provide the details. As mentioned, Appellant's mother actually located Arthur according to her statement and his father drove her to Arthur's house around 2005, on the heels of the 2004 Cowfer affidavit.[15] Yet, despite finding Arthur, Appellant stated that he never asked his mother any questions about him or where he lived. When his mother visited him in prison on July 10, 2017, he failed to inform her of this miraculous recantation letter or his latest appeal.[16]

Given the insufficiency of the evidence presented by Appellant to support the authentication of the recantation letter, purportedly written by Arthur, we conclude that the PCRA court did not abuse its discretion in declining to admit it into evidence.

Nonetheless, determined to prove the letter's authenticity, Appellant sought to bootstrap the affidavit allegedly made by Zawodniak in 2010,[17] years prior to her death on March 8, 2020. Appellant sought to introduce and admit the affidavit into evidence under hearsay exception for statements

---

[15] Appellant's parents were present for the March 8, 2021 hearing. Appellant, however, did not call them to the stand.

[16] Although we cannot make factual findings, we note with interest that, on June 12, 2017, Appellant filed the instant—his fifth—PCRA petition with the recantation letter after the federal district court denied his motion for reconsideration on June 8, 2017. Commonwealth's Brief at 46-47. The filing occurred a mere four days after the denial of reconsideration.

[17] As noted, the Zawodniak affidavit first emerged in connection with Appellant's third petition, which the PCRA court dismissed as untimely on November 16, 2010. We affirmed the dismissal on appeal.

against interest, Pa.R.E. 804(b)(3). However, as with the recantation letter, the PCRA court determined that Appellant simply failed to authenticate the affidavit and that, even if he had done so, he failed to satisfy any hearsay exceptions for purposes of admitting the affidavit into evidence. Appellant now claims that the PCRA court abused its discretion. We disagree.

In support of his contention, Appellant points out that the affidavit was authenticated and reliable because it was made in the presence of a duly licensed notary, Ms. Meade, formerly Holfelder. To buttress this point, Appellant relies upon *Commonwealth v. Thomas*, 908 A.2d 351 (Pa. Super. 2006). The reliance, however, is misplaced as the instant case is distinguishable. In *Thomas*, the defendant sought collateral relief and, in support, attached an affidavit/declaration from an eyewitness. During the evidentiary hearing, counsel for the defendant advised that the declarant had died, requested a continuance of the hearing, and asked to submit a memorandum requesting the court to admit the declaration as substantive evidence. The PCRA court denied this request and dismissed the petition on the ground that the declaration constituted inadmissible hearsay.

On appeal, the defendant argued, among other things, that the declaration should have been admitted into evidence. He conceded that the declaration did not fit within a firmly-rooted exception to the hearsay rule, but argued that it was "admissible as substantive evidence because it evinces overwhelming indicia of reliability and trustworthiness." *Id.* at 354 (internal citation omitted). In rejecting this argument, we determined that, although

signed subject to the penalty of perjury, the declaration did not meet the requirements of an affidavit because the declarant did not swear to her statements before an officer authorized to administer oaths. Thus, we concluded that the accuracy and circumstances surrounding the execution of the declaration were at issue. We also concluded that, because the declarant could not testify, her credibility and demeanor could not be assessed by the trier of fact. Finally, we determined that if the declaration was admitted as substantive evidence, the Commonwealth would not have the opportunity to test the declarant's account of the incident and her identification of a different man as the murderer. *See id.* at 354-55.

Appellant attempts to differentiate this case from *Thomas*, highlighting that the Zawodniak affidavit was sworn before a licensed notary and that "[t]his distinguishing factor creates an indicium of reliability and trustworthiness." Appellant's Brief at 23. The record, however, does not lend support to Appellant's assertions. As the PCRA court noted, the circumstances surrounding the creation of the affidavit were wholly unreliable. *See* PCRA Court Opinion, 9/29/21, at 9. The court reasoned:

> The notarization of the affidavit was performed by an individual who was familiar with, and sympathetic to [Appellant's] family, and had visited [Appellant] in prison on numerous occasions in the time period of 2008 through 2010. Additionally, the Commonwealth did not have the opportunity for cross-examination, and Zawodniak's credibility and demeanor were not able to be assessed by the trier of fact.

*Id.* Moreover, the record reveals that Meade, formerly Holfelder, offered inconsistent testimony. Although Appellant previously identified her as his "assistant" for the purpose of speaking with his co-defendants in support of his 2010 PCRA petition, Meade tried to portray herself as simply performing an innocent official notary function with no understanding of the significance to Appellant's appeal and with no interest in the outcome of Appellant's case. Meade testified: "I'm not part of the case. I literally just notarized the paper." N.T., Hearing, 3/8/21, at 21-25. Meade's testimony was undercut by the record. Meade visited Appellant in prison on the following dates: October 13, 2008, January 1, 2009, March 29, 2009, July 19, 2009, January 1, 2010, April 22, 2010, September 24, 2010 and October 14, 2010. Additionally, Meade also wrote a statement in support of Appellant's 2010 PCRA petition. In the statement, Meade stated in relevant part:

> Approximately August of 2009, I started assisting Steven Vogt with some of the clerical and other paperwork regarding his habeas petition after seeing the clear constitutional violation that occurred in his trial. I took it upon myself to look for the parties involved in the case. I did try finding the parties through regular methods and utilized search engines such as google.com. . . . After paying the fees I found an address and phone number for Margaret Zawadniak [sic]. I called the number and Ms. Zawadniak was quite difficult and said she has not talked about the case to anyone over the years, not even her family. . . . She finally agreed to make a written statement and did so on August 25, 2010.

Meade (Holfelder) Statement, 9/14/10, attached as Exhibit B to Appellant's Third PCRA Petition. Accordingly, based on the foregoing, we cannot conclude that the PCRA court abused its discretion in finding the affidavit unreliable and

determining that Appellant failed to offer sufficient evidence to authenticate it.[18]

In sum, in light of the foregoing, the PCRA court did not abuse its discretion in declining to admit into evidence the purported recantation letter and affidavit and therefore, denying Appellant's after-discovered evidence claim.

Lastly, we address Appellant's claim that the PCRA court erred when it failed to *sua sponte* take judicial notice and consider the Third Circuit decision filed on August 9, 2021 in connection with his civil action against the Secretary of the Department of Corrections and the mailroom employees at SCI-Fayette.[19]  Appellant, however, does not explain how or why the Third Circuit decision is relevant or material to the claims asserted in the instant—his fifth—

---

[18] Even if Appellant somehow was able to authenticate the affidavit, it still would not have been admitted into evidence because it does not fall into any hearsay exceptions.  Specifically, there simply is no evidence of record to explain how the Zawodniak affidavit could possibly be construed as a former testimony or statement against interest under Pa.R.E. 804(b).

[19] This Court has explained the proper exercise of judicial notice:

> Pa.R.E. 201(b) governs judicial notice of adjudicative facts.  The rule provides: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Pa.R.E. 201(b).  "A court may take judicial notice of an indisputable adjudicative fact."  **Interest of D.S.**, 622 A.2d 954, 957 (PA. Super. 1993).  A fact is indisputable if it is so well established as to be a matter of common knowledge.  **Id.**  Judicial notice is intended to avoid the formal

*(Footnote Continued Next Page)*

PCRA petition. Indeed, as noted earlier, the Third Circuit decision was inapplicable to the instant dispute and it did not terminate Appellant's federal litigation, because the court simply vacated the District Court's order dismissing Appellant's Fourteenth Amendment procedural due process claim and directing the District Court to address it at summary judgment or trial, as appropriate. **See Vogt**, 8 F.4th at 187. Because the Third Circuit decision pertained solely to Appellant's constitutional claims, and therefore had no bearing on the outcome of Appellant's PCRA petition, we discern no error, regardless of whether the PCRA court took judicial notice or considered the circuit court decision. Appellant obtains no relief.

Order affirmed.

Judge Murray joins the memorandum.

Judge McLaughlin concurs in the result.

_____

introduction of evidence in limited circumstances where the fact sought to be proved is so well known that evidence in support thereof is unnecessary. **220 Partnership v. Philadelphia Elec. Co.**, 650 A.2d 1094, 1096 (Pa. Super. 1994).

Judicial notice allows the trial court to accept into evidence indisputable facts to avoid the formality of introducing evidence to prove an incontestable issue. **D.S.**, 622 A.2d at 957. However, the facts must be of a matter of common knowledge and derived from reliable sources "whose accuracy cannot reasonably be questioned." Pa.R.E. 201(b)(2).

**Commonwealth v. Brown**, 839 A.2d 433, 435 (Pa. Super. 2003). Here, Appellant does not claim that the Third Circuit decision determined any adjudicative facts material to this appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/31/2023